## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**JOHN DOE**,

      Plaintiff,

      vs.                     No. 08cv1041MCA/LFG

**CITY OF ALBUQUERQUE,**

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on *Plaintiff's Motion for Summary Judgment* [Doc. 43], filed May 15, 2009.  Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court grants the motion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The following allegations are taken from Plaintiff's *Complaint for Injunctive and Declaratory Relief* and, for purposes of his summary-judgment motion, are viewed in a light most favorable to the non-movant, Defendant City of Albuquerque, with all reasonable inferences being drawn in its favor.  See Turner v. Public Service Co. of Colorado, 563 F.3d 1136, 1142 (10th Cir. 2009).

Plaintiff John Doe ("John Doe") is registered with the State of New Mexico as a convicted sex offender. [Doc. 1; Exh. A at 2].  On March 4, 2008, Defendant City of Albuquerque ("the City"), through an administrative instruction ("administrative instruction" or "regulation"), officially banned all registered sex offenders from using and/or entering any

of the City's public libraries. [Id.; Exh. A at 2].  The administrative instruction provides:

> Registered sex offenders are not allowed in public libraries in the City of Albuquerque.  This ban includes any person currently registered under the Megan's law of any state, the New Mexico Sex Offender Registration and Notification Act or the Albuquerque Sex Offender Registration and Notification Act. Library staff shall send a letter to every sex offender who has a library card and inform them they are no longer allowed in our libraries.  The Albuquerque Police Department, the Bernalillo County Sheriff's Office, the New Mexico State Police and other law enforcement agencies shall enforce this ban.

[Id.; Exh. A, Attachment 1].

As a former user of the City libraries and a holder of a City library card, John Doe received the letter referred to in the administrative instruction, informing him that he had been banned. [Doc. 1; Exh. A at 3].  John Doe alleges that, prior to the ban, he "frequently visited the City's public libraries, checked out books, CDs, used other reference material available to him, and attended meetings and lectures. . . ." [Id.; Exh. A at 3].  Given the ban, however, he now lacks access to the City's public libraries and therefore is unable to receive information contained in books, magazines, newspapers, movies, and CDs. [Id.; Exh. A at 3].  Additionally, given that the express terms of the administrative instruction mandate enforcement of the ban by "[t]he Albuquerque Police Department, the Bernalillo County Sheriff's Office, the New Mexico State Police, and other law enforcement agencies[,]" any attempt by John Doe to enter any of the City's public libraries would subject him to a credible threat of prosecution.  [Id.; Exh. A at 3].  John Doe alleges that the administrative instruction "constitutes an official City policy, custom, and practice." [Id.; Exh. A at 2].

In response to the administrative instruction and the City's ban against registered sex offenders in public libraries, John Doe, on October 9, 2008, filed his *Complaint for Injunctive and Declaratory Relief* in the State of New Mexico, County of Bernalillo, Second Judicial District. [Doc. 1; Exh. A].  In his complaint, which he brings pursuant to 42 U.S.C. § 1983 and the New Mexico Declaratory Judgment Act, he alleges violations of rights secured by (1) the First Amendment to the United States Constitution (Count I); (2) the Fourteenth Amendment to the United States Constitution (substantive due process, procedural due process, and equal protection) (Counts II, III, and IV); (3) Article II of the New Mexico Constitution, Section 17 (free speech) (Count V); (4) Article II of the New Mexico Constitution, Section 18 (substantive due process, procedural due process, and equal protection) (Counts VI, VII, and VIII); and (5) Article II of the New Mexico Constitution, Section 4 (inherent rights) (Count IX).[1]

Pursuant to 28 U.S.C. § 1443(b), the City timely removed the matter to this Court and, on the same day, November 6, 2008, moved to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), on the ground that "Plaintiff's Complaint does not state a cognizable claim as a matter of law. . . ."  [See Doc. 1; Doc. 3 at 1].  By *Order* entered September 30, 2009, this Court denied the motion. [See Doc. 57].

After the City filed its motion to dismiss, but before the Court ruled on the motion, John Doe, on May 15, 2009, filed the summary-judgment motion that is now before the

---

[1]  On April 10, 2009, the parties stipulated to the dismissal of the state and federal procedural due process claims that had been asserted in Counts III and VII. [See Doc. 36].

Court. [See generally Doc. 43].

## II. ANALYSIS

### A. Standard of Review

#### 1. Summary Judgment; Fed.R.Civ.P. 56

The Court may enter summary judgment "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Wolf v. Prudential Ins. Co. of Am., 50 F.3d 793, 796 (10th Cir.1995) (quoting Fed.R.Civ.P. 56©). A "genuine issue" exists where the evidence before the Court is of such a nature that a reasonable jury could return a verdict in favor of the non-moving party as to that issue. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-52 (1986). An issue of fact is "material" if under the substantive law it is essential to the proper disposition of the claim. See id. at 248.

When, as here, the movant is also the party bearing the burden of persuasion with regard to the claim on which a summary judgment is sought, the movant must show that the record as a whole satisfies each essential element of its case and negates any affirmative defenses in such a way that no rational trier of fact could find for the non-moving party. See 19 Solid Waste Dep't Mechanics v. City of Albuquerque, 156 F.3d 1068, 1071 (10th Cir. 1998); Newell v. Oxford Mgmt., Inc., 912 F.2d 793, 795 (5th Cir. 1990); United Missouri Bank of Kansas City, N.A. v. Gagel, 815 F. Supp. 387, 391 (D.Kan. 1993). The admissions in a party's answer to a complaint are binding for purposes of determining whether the

4

movant has made such a showing.  See Missouri Housing Dev. Comm'n v. Brice, 919 F.2d 1306, 1314-15 (8th Cir. 1990).  Similarly, the Court may consider any undisputed material facts set forth in the motion papers which are deemed admitted by operation of D.N.M. LR-Civ.56.1.  See LaMure v. Mut. Life Ins. Co. of N.Y., 106 F.3d 413, 1997 WL 10961, at *1 (10th Cir. 1997) (unpublished disposition); Smith v. E.N.M. Med. Ctr., 72 F.3d 138, 1995 WL 749712, at *4 (10th Cir. 1995) (unpublished disposition); Waldridge v. American Hoechst Corp., 24 F.3d 918, 920-24 (7th Cir.1994) (approving use of local rule similar to D.N.M. LR-Civ. 56.1(b)).

Further, "[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading. . . ."  Fed.R.Civ.P. 56(e).  Nor will unsupported conclusory allegations create a genuine issue of fact.  Harrison v. Wahatoyas, L.L.C., 253 F.3d 552, 557 (10th Cir. 2001).  Rather, "the adverse party's response . . . must set forth specific facts showing a genuine issue for trial."  Fed.R.Civ.P. 56(e).  Judgment is appropriate as a matter of law if the nonmoving party has failed to make an adequate showing on an essential element of its case, as to which it has the burden of proof at trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Lopez v. LeMaster, 172 F.3d 756, 759 (10th Cir. 1999).

Apart from these limitations, it is not the Court's role to weigh the evidence, assess the credibility of witnesses, or make factual findings in ruling on a motion for summary judgment.  Rather, the Court assumes the admissible evidence of the non-moving party to be true, resolves all doubts against the moving party, construes all admissible evidence in the

light most favorable to the non-moving party, and draws all reasonable inferences in the non-

moving party's favor.  See Hunt v. Cromartie, 526 U.S. 541, 551-52 (1999).

### B. 42 U.S.C. § 1983

John Doe brings this action pursuant to 42 U.S.C. § 1983.  Section 1983 of Title 42

of the United States Code provides, in relevant part, that

> [e]very person who, under color of any statute, ordinance,
> regulation, custom, or usage, of any State or Territory or the
> District of Columbia, subjects, or causes to be subjected, any
> citizen of the United States or other person within the
> jurisdiction thereof to the deprivation of any rights, privileges,
> or immunities secured by the Constitution and laws, shall be
> liable to the party injured in an action at law, suit in equity, or
> other proper proceeding for redress.

42 U.S.C. § 1983.  Section 1983 is not an independent source of substantive rights; rather it

is a mechanism for enforcing federal rights conferred elsewhere, see Albright v. Oliver,  510

U.S. 269, 271 (1994), and provides a remedy "for any person who has been deprived of

rights secured by the Constitution or laws of the United States by a person acting under color

of law." Curley v. Klem, 298 F.3d 271, 277 (3rd Cir.2002).  Accordingly, an analysis of a

plaintiff's federal civil-rights claim necessarily begins by identifying the specific

constitutional right or rights allegedly infringed.  Graham v. Connor, 490 U.S. 386, 393-94

(1989).

With respect to his federal claims,[2] John Doe asserts that he possesses a First Amendment right to receive information in Albuquerque's public libraries, as well as a First Amendment right to assemble there for the purpose of attending meetings, exhibits, and other events, and that the City has infringed upon these rights by enacting the regulation in question. He also contends that a wholesale ban that prevents registered sex offenders from entering public libraries works a violation of his Fourteenth Amendment right to substantive due process. Finally, he argues that he has been denied equal protection of the laws because, even though registered sex offenders are admittedly not a suspect class, restrictions against whom are accorded no more than rational basis review, the City's enactment nevertheless is arbitrary and irrational. [Doc. 44 at 8-22].

The City contends, and John Doe freely admits, that he is mounting a facial (as opposed to an "as-applied") First Amendment challenge to the regulation in question, and the Court considers his challenge as such. [See Doc. 47 at 1-3 (interpreting John Doe's challenge as a facial challenge); Doc. 51 at 3 n.1 ("Plaintiff reasserts that he brings his lawsuit as a facial challenge as has been consistently stated.")].

In distinguishing facial from as-applied First Amendment challenges, our Tenth Circuit has explained that

> [t]here are two types of First Amendment challenges that can be brought against a city policy, facial and as applied. A facial challenge considers the restriction as a whole, while an

---

[2] John Doe also asserts claims arising under the laws of the State of New Mexico. Because the Court disposes of this matter on the basis of those claims brought pursuant to federal law, the Court does not address John Doe's state-law claims.

> as-applied challenge tests the application of that restriction to
> the facts of a plaintiff's concrete case. Facial challenges seek to
> vindicate not only individual plaintiffs' rights but also those of
> all others who wish to engage in the speech being prohibited.

Faustin v. City and County of Denver, Colo., 423 F.3d 1192, 1196 (10th Cir. 2005) (internal

citations omitted).  A municipal policy may be deemed unconstitutional upon a conclusion

that any attempt to enforce it would create "an unacceptable risk of the suppression of ideas."

Am. Target Advertising, Inc. v. Giani, 199 F.3d 1241, 1247 (10th Cir. 2000) (internal

quotation omitted).

### C. The First Amendment: The Right to Receive Information (A General Overview of Significant United States Supreme Court Cases)

The First Amendment to the United States Constitution provides that

> Congress shall make no law respecting an establishment of
> religion, or prohibiting the free exercise thereof; or abridging the
> freedom of speech, or of the press; or the right of the people
> peaceably to assemble, and to petition the Government for a
> redress of grievances.

U.S. CONST. AMEND. I.

It has long been "well established that the Constitution protects the right to receive

information and ideas." Stanley v. Georgia, 394 U.S. 557, 564 (1969).  Indeed, in effectively

invalidating a city ordinance making it unlawful for "any person distributing handbills,

circulars or other advertisements to ring the door bell, sound the door knocker, or otherwise

summon the inmate or inmates of any residence to the door for the purpose of receiving such

handbills, circulars or other advertisements they or any person with them may be

distributing[,]" the United States Supreme Court commented that

> [t]he right of freedom of speech and press has broad scope. The authors of the First Amendment knew that novel and unconventional ideas might disturb the complacent, but they chose to encourage a freedom which they believed essential if vigorous enlightenment was ever to triumph over slothful ignorance. *This freedom embraces the right to distribute literature . . . and necessarily protects the right to receive it.*

Martin v. City of Struthers, Ohio, 319 U.S. 141, 142, 143 (1943) (emphasis added).  "This right to receive information and ideas, regardless of their social worth," explained the Stanley Court, "is *fundamental* to our free society."  Stanley, 394 U.S. at 564 (emphasis added).

The Court again spoke of the constitutional right to receive information when it struck down a  postal statute mandating the Postmaster General's seizure and detention of mail originating in foreign countries, which was "determined by the Secretary of the Treasury pursuant to rules and regulations to be promulgated by him to be 'communist political propaganda[,]'" pending notification of the recipient and the recipient's subsequent written request to receive such mail.  Lamont v. Postmaster General of U. S., 381 U.S. 301, 302 (1965).  In invalidating § 305(a) of the Postal Service and Federal Employees Salary Act of 1962 ("Postal Service § 305(a)"), the Court "rest[ed] on the narrow ground" that requiring an addressee to request—in writing—that his mail be delivered to him amounted "to an unconstitutional abridgement of the addressee's First Amendment rights [inasmuch as t]he addressee carrie[d] an affirmative obligation which [the Court did] not think the Government [could] impose on him."  Id. at 305.  Section 305(a), therefore, was "at war with the 'uninhibited, robust, and wide-open' debate and discussion that are contemplated by the First Amendment."  Id. at 305-406 (*citing*  New York Times Co. v. Sullivan, 376 U.S. 254, 270

(1964)).

In a concurrence that is highly instructive for purposes of this Court's analysis of John Doe's First Amendment arguments, Justice Brennan identified the constitutional right implicated by Postal Service § 305(a) as an addressee's First Amendment entitlement to receive information in the form of delivered materials, which he deemed "a fundamental right." Lamont, 381 U.S. at 308 (Brennan, J., concurring). He explained:

> It is true that the First Amendment contains no specific guarantee of access to publications. However, the protection of the Bill of Rights goes beyond the specific guarantees to protect from congressional abridgment those equally fundamental personal rights necessary to make the express guarantees fully meaningful. *I think the right to receive publications is such a fundamental right. The dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to receive and consider them. It would be a barren marketplace of ideas that had only sellers and no buyers.*

Id. at 308 (Brennan, J., concurring) (internal citations omitted) (emphasis added).[3]

Emphasizing the all-important nature of First Amendment rights, Justice Brennan was not persuaded by the government's position that, since an addressee could receive a seized publication by making a written request for its delivery, Postal Service § 305(a) at most

---

[3] Similarly, in Griswold v. Connecticut, the Court explained that

> the State may not, consistently with the spirit of the First Amendment, contract the spectrum of available knowledge[, as t]he right of freedom of speech and press includes not only the right to utter or to print, but the right to distribute, the right to receive, the right to read . . . and freedom of inquiry [and] freedom of thought. . . .

Griswold v. Connecticut, 381 U.S. 479, 482 (1965).

inconvenienced—but did not abridge—the addressee's constitutional rights and, therefore, passed muster. Instead, he stated firmly and simply that "inhibition as well as prohibition against the exercise of precious First Amendment rights is a power denied to government." Lamont, 381 U.S. at 309 (Brennan, J., concurring). Even if Postal Service § 305(a) could be viewed as imposing nothing more than an inconvenience on the addressee, Justice Brennan made clear that the Court could not "sustain an intrusion of First Amendment rights on the ground that the intrusion is only a minor one."   Id. at 309 (Brennan, J., concurring). Rather, in commentary that guides this Court today, he stressed that

> [i]n the area of First Amendment freedoms, government has the duty to confine itself to the least intrusive regulations which are adequate for the purpose[, and that i]f the Government wishes to withdraw a subsidy or a privilege, it must do so by means and on terms which do not endanger First Amendment rights.

Id. at 310 (Brennan, J., concurring).

That the First Amendment right to receive information arises in contexts other than those involving written materials and publications is evidenced by Conant v. Walters, in which the Ninth Circuit affirmed the entry of a permanent injunction preventing enforcement of a federal policy that threatened to punish physicians who communicated with their patients about the medical use of marijuana.  Conant v. Walters, 309 F.3d 629, 633, 639 (9th Cir. 2002).  In a concurrence harking back to Lamont and written solely to express his view that "the fulcrum of th[e] dispute [was] not the First Amendment right of the doctors[,]" but, instead, the rights of *patients* who, in the absence of the injunction, would "be denied information crucial to their well-being," now-Chief Judge Alex Kozinski framed the issue

as the right to hear and receive information.  Conant v. Walters, 309 F.3d 629, 639-640, 643 (9th Cir. 2002) (Kozinski, J., concurring).  Viewing the right to hear and the right to speak as "flip sides of the same coin[,]" Judge Kozinski repeated Justice Brennan's observation from Lamont that "'[i]t would be a barren marketplace of ideas that had only sellers and no buyers.'" Conant, 309 F.3d at 643 (Kozinski, J., concurring) (*quoting* Lamont, 381 U.S. at 308) (Brennan, J., concurring).  Judge Kozinski commented that, while the right to speak and the right to receive information might not always carry the same weight, and "denial of the right to speak is never trivial," Conant, 309 F.3d at 643 (Kozinski, J., concurring), there do exist situations in which the practical realities of hearing the message make the right to receive information more important than the right to send it.  See id. at 643-644; see also 1 SMOLLA & NIMMER ON FREEDOM OF SPEECH § 2:73 (2009).  Such was the case in Conant, reasoned Judge Kozinski, where "the simple fact [was] that if the injunction were denied, the doctors would be able to continue practicing medicine and go on with their lives more or less as before."  Conant, 309 F.3d at 644 (Kozinski, J., concurring).  Ailing patients, however, would bear the brunt of this First Amendment deprivation by being denied competent medical advice.  Patients' First Amendment right to hear and receive information provided by their physicians, according to Judge Kozinski, provided even more reason to affirm the district court's decision to enjoin the policy in question.  See id. at 648 (Kozinski, J., concurring) ("In affirming the district court, I therefore find comfort in knowing that the interests of the patients . . . provide significant additional support for the district court's exercise of discretion.").  Judge Kozinski's concurrence underscores the continued vitality

in the 21st century of the right to receive information, which right was first identified by the United States Supreme Court in 1943, see Martin, 319 U.S. at 143, and deemed "fundamental to our free society[]" in 1969, see Stanley, 394 U.S. at 564.

### D. The First Amendment: The Right to Receive Information (Libraries)

#### 1. *Kreimer v. Bureau of Police for Town of Morristown*, 958 F.2d 1242 (3rd Cir. 1992)

A number of federal courts have addressed the right to receive information in cases arising in the specific context of challenges to public-library policy.  For example, in Kreimer v. Bureau of Police for Town of Morristown, the Third Circuit held that the First Amendment right to receive information, "first recognized in Martin and refined in later First Amendment jurisprudence, includes the right to some level of access to a public library, the quintessential locus of the receipt of information."  Kreimer v. Bureau of Police for Town of Morristown, 958 F.2d 1242, 1255 (3rd Cir. 1992) ("Kreimer II").  The issue in Kreimer II was the enforceability of a written policy promulgated by Morris Township (N.J.) and the Joint Free Public Library of Morristown that expressly prohibited certain behavior in the library and authorized the library's director to expel any patron deemed to be in violation.  Id. at 1247.  The plaintiff, Richard Kreimer, was a homeless resident of Morristown who frequently visited the library to read books, newspapers, and magazines, and also to sit "in quiet contemplation."  Id. at 1246-47.  He was expelled on at least two occasions for having violated library rules (1) against nonengagement "in normal activities associated with the use of a public library while in the building[;]" and (2) demanding that "[p]atron dress and

personal hygiene . . . conform to the standard of the community for public places."[4]  Id. at

_____

[4]  In their entirety, the challenged provisions of the policy read:

> 1. Patrons shall be engaged in normal activities associated with the use of a public library while in the building. Patrons not engaged in reading, studying, or using library materials may be asked to leave the building. Loitering will not be tolerated.

> 5. Patrons shall respect the rights of other patrons and shall not annoy others through noisy or boisterous activities, by unnecessary staring, by following another person through the building, by playing walkmans or other audio equipment so that others can hear it, by singing or talking to oneself or any other behavior which may reasonably result in the disturbance of other persons.

> 9. Patron dress and personal hygiene shall conform to the standard of the community for public places. This shall include the repair or cleanliness of garments.

Kreimer II, 958 F.2d at 1247.

Following a complaint lodged by the ACLU of New Jersey, however, paragraph 1 was revised to read:

> 1. Patrons shall be engaged in activities associated with the use of a public library while in the building. Patrons not engaged in reading, studying, or using library materials shall be asked to leave the building.

Accordingly, as revised, paragraph 1 removed any reference to "normal" activities; (2) made the expulsion of in-violation library patrons mandatory; and (3) removed any reference to "loitering."  Kreimer v. Bureau of Police for Town of Morristown, 765 F.Supp. 181, 184 (D.N.J. 1991) ("Kreimer I").

Paragraph 5 was revised to read:

> Patrons shall respect the rights of other patrons and shall not harass or annoy others through noisy or boisterous activities, by unnecessary staring at another with the intent to annoy that person, by following another person about the building with the intent to annoy that person, by playing walkmans or other audio equipment so that others can hear it, by singing or talking to oneself or any other behavior which may reasonably result in the disturbance of

1247.

Mr. Kreimer brought suit pursuant to 42 U.S.C. § 1983, alleging, among other things, that the policy constituted a violation of his First Amendment right to receive information and ideas, "and identifie[d] the 'vital role played by public libraries' in promoting the fullest exercise of that right."  Kreimer II, 958 F.2d at 1251.  Applying strict scrutiny, the district court partially invalidated the policy, having determined that the policy (specifically paragraphs 1 and 9) was not narrowly tailored to serve the stated significant government interest, nor did it leave open any alternative means of access to publicly provided reading materials for patrons who were consequently denied the privilege of library access.  Kreimer I, 765 F.Supp. at 187.  The restrictions, explained the district court, especially the command in paragraph 1 that patrons not actively using library materials be removed from the building, bore no relation to the library's stated purpose of "preserving the peace and quiet of the facility for the benefit of all patrons."  Id. at 189.  Accordingly, the

---

other persons.

Paragraph 9 was revised to read:

> Patrons shall not be permitted to enter the building without a shirt or other covering of their upper bodies or without shoes or other footwear. Patrons whose bodily hygiene is so offensive as to constitute a nuisance to other persons shall be required to leave the building.

Id.  Finally, the policy was revised to mandate the denial of library access to violators.  See id. at 185 (revised policy providing that "[a]ny patron who violates the library rules and regulations *shall* be denied the privilege of access to the library[,]" whereas original policy provided that "[a]ny patron who violates the library rules and regulations *may* be denied the privilege of access to the library. . . .") (emphasis added).

> court conclude[d] that paragraphs 1, 5, and 9 of the library
> policy [were] not reasonable time, place, or manner restrictions
> which serve[d] the state's significant interest in maintaining the
> library atmosphere at a level conducive to all patrons' use of the
> facility. As such, these paragraphs violate[d] the First
> Amendment of the United States Constitution.

Id.

The Third Circuit reversed and remanded.  Accepting that "[a] library is 'a place dedicated to quiet, to knowledge, and to beauty'[5][, the] very purpose [of which] is to aid in the acquisition of knowledge through reading, writing and quiet contemplation[,]" the circuit nevertheless concluded that, rather than apply strict scrutiny to determine whether paragraphs 1 and 5 amounted to time, place, or manner restrictions that were narrowly tailored to serve a significant governmental interest, the district court should merely have gauged their reasonableness, as those provisions did not limit First Amendment activities that had been specifically permitted in the library.  Kreimer II, 958 F.2d at 1261, 1262.  Under this standard, the circuit deemed paragraphs 1 and 5 reasonable, because these provisions prohibited (1) activities that went beyond the purpose for which the library was opened; (paragraph 1), as well as (2) behavior that disrupted or tended to disrupt the library setting (paragraph 5).  Id. at 1262-63.

As for paragraph 9, the circuit concluded that, because this provision would require the expulsion of a patron who might otherwise be peacefully engaged in permissible First Amendment activities within the purposes for which the library was opened (*i.e.*, reading,

---

[5] Brown v. Louisiana, 383 U.S. 131, 142 (1966).

16

writing, or quiet contemplation), review was for the purpose of "determin[ing] whether the rule [was] narrowly tailored to serve a significant government interest and whether it [left] ample alternative channels of communication."  Kreimer II, 958 F.2d at 1264.

Reminding that the "narrowly tailored" requirement did not did not mean that the library was obligated to employ the least restrictive or least intrusive means of furthering its interests, the circuit explained that "the requirement of narrow tailoring is satisfied so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation."  Kreimer II, 958 F.2d at 1264 (internal quotations omitted); see also Ward v. Rock Against Racism, 491 U.S. 781, 798 (1989).

Paragraph 9 satisfied the "narrowly tailored" requirement, reasoned the circuit, because a regulation mandating that library patrons "have non-offensive bodily hygiene" furthered the library's goals of allowing all patrons' use and enjoyment of the library, as well as its "interest in maintaining its facilities in a sanitary and attractive condition."  Kreimer II, 958 F.2d at 1264.   Finally, paragraph 9 left open "ample alternative channels of communication" because even an ejected patron could eventually return to the library— and therefore was not permanently barred—so long as the patron complied with the library's rules.  Id.

## 2. *Armstrong v. Dist. of Columbia Pub. Library*, 154 F.Supp.2d 67 (D.D.C. 2001)

In Armstrong v. Dist. of Columbia Pub. Library, the regulation promulgated by the District of Columbia Public Library instructed library personnel to deny access to potential

patrons with "objectionable appearance" ("the appearance regulation").  Armstrong v. Dist. of Columbia Pub. Library, 154 F.Supp.2d 67, 70 (D.D.C. 2001).  Richard Armstrong was a resident of an area shelter who arrived at the Martin Luther King Memorial Library on February 14, 1993, dressed in a shirt, shoes, pants, several sweaters, and two winter jackets. He was stopped at the library entrance, denied access, told to "clean up," and directed to leave the building, which he did.  Id.  Mr. Armstrong subsequently filed suit pursuant to 42 U.S.C. § 1983, arguing, among other things, that the appearance regulation was both vague and overbroad, in violation of the First Amendment.  Id. at 69.

The United States District Court for the District of Columbia agreed with Mr. Armstrong.  The court looked to Kreimer II for guidance and, as did both the Kreimer I and Kreimer II courts, began with the pronouncement that "[i]t is well-established and can hardly be disputed that 'the Constitution protects the right to receive information and ideas.'" Armstrong, 154 F.Supp.2d at 75 (quoting Stanley, 394 U.S. at 564).  Recognizing that Kreimer II applied a reasonableness standard to restrictions relating to conduct deemed antithetical to the nature of the library (paragraphs 1 and 5), but required narrow tailoring for that provision mandating the expulsion of a hygienically offensive patron who might otherwise be peacefully engaged in permissible First Amendment activities (paragraph 9), the Armstrong court determined that the appearance regulation before it could survive constitutional scrutiny only if it were "narrowly tailored to serve a significant governmental interest and [left] open ample alternative channels for communication of information." Id. The court reasoned that "[s]ince the effect of [the appearance] regulation [was] to prevent

certain patrons from engaging in *any* conduct within, or use of, the library, protected First Amendment activities such as reading, writing and quiet reflection [were] directly limited." Id. (emphasis in original).

As a content-neutral regulation limiting protected First Amendment activities inside the library, therefore, the appearance regulation amounted to a time, place, and manner restriction demanding narrow tailoring to serve a significant governmental interest. Armstrong, 154 F.Supp.2d at 75-76.  The court, however, determined that the regulation was not sufficiently narrowly tailored because it was "amorphous" inasmuch as it "impermissibly vest[ed] unfettered and subjective enforcement discretion in whomever the regulation enforcer happen[ed] to be at a given hour or day." Id. at 82.  Additionally, the appearance regulation was "imprecise" and  provided no articulable standard to guide either government officials or employees tasked with enforcing it, or a public expected to "conform its conduct to the barring regulation's vague requirements." Id.  For these reasons, the court held the appearance regulation "unconstitutionally vague and overbroad under settled First . . . Amendment principles" and enjoined its application.  Id.

### 3. *Neinast v. Bd. of Trustees of Columbus Metro. Library*, 346 F.3d 585 (6th Cir. 2003)

Finally, in Neinast v. Bd. of Trustees of Columbus Metro. Library, the issue before the Sixth Circuit was the constitutionality of a regulation promulgated by the Columbus (OH) Metropolitan Library requiring library patrons to wear shoes while on library premises. Neinast v. Bd. of Trustees of Columbus Metro. Library, 346 F.3d 585, 589 (6th Cir. 2003).

Following several evictions for failing to wear footwear in the library, plaintiff/library patron Robert Neinast brought suit pursuant to 42 U.S.C. § 1983, alleging, among other things, that "enforcement of the requirement that patrons of the Library wear shoes deprived him of his right to receive information under the First . . . Amendment[]." Id. at 590.

Affirming the district court's entry of summary judgment for the defendants, the Sixth Circuit, as did the courts in Kreimer I, Kreimer II, and Armstrong, laid out the underlying premise that the First Amendment protects the right to receive information and, further, that "[t]his right to receive information 'includes the right to some level of access to a public library, the quintessential locus of the receipt of information.'" Neinast, 346 F.3d at 591 (quoting Kreimer II, 958 F.2d at 1255). However, whereas the appearance regulation in Armstrong "prevent[ed] certain patrons from engaging in any conduct within, or use of, the library," Armstrong, 154 F.Supp.2d at 75 (emphasis in original), and, therefore, directly limited protected First Amendment activities, the regulation in Neinast did not "directly impact the right to receive information." Neinast, 346 F.3d at 591-592. The Neinast regulation was accordingly reviewed for reasonableness, with the Sixth Circuit concluding that the regulation survived rational basis review because it provided "a rational means to further the legitimate government interests of protecting public health and safety and protecting the Library's economic well-being by seeking to prevent tort claims brought by library patrons who were injured because they were barefoot." Id. at 592.

The Sixth Circuit also concluded that, even if strict scrutiny were to apply, the regulation in question still would be constitutionally valid because the requirement that

library patrons wear shoes was narrowly tailored to the significant governmental interest of safeguarding the well-being of the library-going public, as well as shielding the library from possible tort claims brought by injured patrons.  See Neinast, 346 F.3d at 593.  Additionally, and importantly, the regulation in Neinast left open ample alternative channels for communication inasmuch as a patron desiring access to the library was required to do no more than comply with the rules and wear shoes.  Id. at 595.

As a final matter, this Court wishes to emphasize that it has carefully reviewed and considered the above-analyzed library cases as part of its tracing of the evolution of the right to receive information, and how that right has been treated in the context of public libraries, *because* the instant case also involves a public library.  The Court does *not* mean to suggest, nor is it finding, that there exists a fundamental right to access, in and of itself, to a public library.

### E. The First Amendment: Applicable Level of Scrutiny and Forum Analysis

#### 1. Strict Scrutiny

Having determined that there exists a First Amendment right to receive information, the Court's next task is to determine the applicable standard of review (or level of scrutiny), which it does by identifying and examining the nature of the forum in question, "because the extent to which the Government may limit access depends on whether the forum is public or nonpublic."  Cornelius v. NAACP Legal Def. and Educ. Fund, Inc., 473 U.S. 788, 797 (1985); see also Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 44 (1983) ("The existence of a right of access to public property and the standard by which limitations

upon such a right must be evaluated differ depending on the character of the property at issue.").

Courts employ a "forum" analysis in evaluating whether a rule or regulation constitutes a First Amendment violation.  Three categories of government fora are relevant to the analysis.

At one end of the spectrum is the category that encompasses those places that "by long tradition or by government fiat have been devoted to assembly and debate. . . ."  Perry, 460 U.S. at 45.  Included in this category of public fora are streets, parks, and public sidewalks, as well as other public spaces that "'have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'"  Id., at 45-46 (quoting Hague v. CIO, 307 U.S. 496, 515 (1939)).  The government's right to limit First Amendment activity in these "quintessential" public fora is strictly circumscribed, and any regulation that does so must (1) be necessary to serve a compelling government or state interest; (2) be narrowly drawn to achieve that end; and (3) leave open ample alternative channels of communication.  Perry, 460 U.S. at 45.

At the other end of the spectrum is the category that encompasses "nonpublic" places that are by neither tradition nor designation maintained for the purpose of facilitating public communication.  Regulations restricting First Amendment activity in these nonpublic fora need only be "reasonable and not an effort to suppress expression because public officials oppose the speaker's view."  Perry, 460 U.S. at 46.

Falling somewhere between these two ends is the category of places constituting "public property [that] the state has opened for use by the public as a place for expressive activity." Perry, 460 U.S. at 45. "The designated public forum, whether of a limited or unlimited character, is one a state creates 'by intentionally opening a non-traditional forum for public discourse.'" Hawkins v. City and County of Denver, 170 F.3d 1281, 1286 (10th Cir. 1999) (quoting Cornelius, 473 U.S. at 802). The government need not open or indefinitely retain the open nature of such places but, once it does, "the government is bound by the same limitations as exist in the traditional public forum context." Kreimer II, 958 F.3d at 1256. In other words, in these "designated" public fora, "[r]easonable time, place and manner regulations are permissible, and a content-based prohibition must be narrowly drawn to effectuate a compelling state interest." Perry, 460 U.S. at 46.

The Court concludes that, for purposes of the instant analysis, a public library constitutes a designated public forum.[6] Our Tenth Circuit, citing Kreimer II, has confirmed

---

[6] The Court notes that there exists some confusion over the terms "designated public forum" and "limited public forum." As the Tenth Circuit defines it, "[a] *designated* public forum is property the government has opened for expressive activity, treating the property as if it were a traditional public forum." Summum v. Callaghan, 130 F.3d 906, 914 (10th Cir. 1997) (emphasis added). A designated public forum may itself "be created for a 'limited purpose' for use 'by certain speakers, or for the discussion of certain subjects.'" Id. (quoting Perry, 460 U.S. at 45-46 n.7). Accordingly, "[s]ometimes included within this category of designated public forum is property sometimes referred to as a '*limited* public forum[,]'" id. (emphasis added), which is a sub-category of a designated public forum that is made available for use by certain speakers for a limited purpose. One example of a "limited public forum" as a sub-category of a larger "designated public forum" can be seen in Widmar v. Vincent, where a state university opened university facilities for meetings of registered student organizations, but excluded from those facilities registered student organizations dedicated to religious worship and teaching. Widmar v. Vincent, 454 U.S. 263, 265-266 (1981). When an otherwise designated public forum is made available for a limited purpose, content-based regulations must be narrowly drawn to effectuate a compelling state interest. Summum, 130 F.3d at 914.

as much in <u>Hawkins</u>.  <u>See</u> <u>Hawkins</u>, 170 F.3d at 1287 ("Examples of designated public fora

include . . . public libraries, <u>see</u> <u>Kreimer v. Bureau of Police for the Town of Morristown</u>,

958 F.2d 1242, 1261 (3rd Cir. 1992).").  For that reason, a regulation directly limiting a

protected First Amendment right must be narrowly tailored to serve a compelling

governmental interest, and must also leave open ample alternative channels for the

communication of ideas.

As already explained, John Doe has a protected First Amendment right to receive

information.  <u>See</u>, <u>e.g.</u>, <u>Stanley</u>, 394 U.S. at 564; <u>Lamont</u>, 381 U.S. at 308 (Brennan, J.,

concurring).  He seeks to exercise this right, as he had before enactment of the regulation in

question, in public libraries in the City of Albuquerque where, in the past, he has checked out

---

By contrast, when the term "limited public forum" is used to describe a type of *nonpublic*
forum, First Amendment restrictions are permissible so long as they are "reasonable in light of
the purpose served by the forum and are viewpoint neutral."  <u>Summum</u>, 130 F.3d at 914-915.
Such nonpublic fora include "public property that is not a designated public forum open for
indiscriminate public use for communicative purposes. . . ." <u>Lamb's Chapel v. Center Moriches
Union Free Sch. Dist.</u>, 508 U.S. 384, 392 (1993).  The government creates "limited public
forum" when it "allows selective access to some speakers or some types of speech in a nonpublic
forum, but does not open the property sufficiently to become a designated public forum."
<u>Summun</u>, 130 F.3d at 916.

While it should be noted that the terms "designated public forum" (opened or made
available for a limited purpose) and "limited public forum" are not interchangeable, it also
should be noted that the Tenth Circuit has "recognize[d] that the boundary between a designated
public forum for a limited purpose (*e.g.*, <u>Widmar</u> ) and a limited public forum (*e.g.*, . . . <u>Lamb's
Chapel</u>) is far from clear."  <u>Summun</u>, 130 F.3d at 916; <u>see also</u> <u>Cook v. Baca</u>, 95 F.Supp.2d
1215, 1221 n.7 (D.N.M. 2000) (noting confusion over terms "designated public forum" and
"limited public forum").  Fortunately, this Court need not reach no farther than <u>Hawkins</u>, in
which the Tenth Circuit, citing <u>Kreimer II</u>, included public libraries in the category of designated
public fora.  <u>See</u> <u>Hawkins</u>, 170 F.3d at 1287 ("Examples of designated public fora include . . .
public libraries. . . .").

books, CDs, and DVDs; read magazines, newspapers, and other periodicals; made use of resource materials; and attended public meeting, events, and exhibits held at the libraries. [Doc. 44; Exh. 1, Affidavit of John Doe].  Each of these activities is consistent with the nature of a library, "a place dedicated to quiet, to knowledge, and to beauty[,]" Brown, 383 U.S. at 142, and an institution that at least one court has called "a storehouse of knowledge." Minarcini v. Strongsville City Sch. Dist., 541 F.2d 577, 581 (6th Cir. 1976).        Because public libraries are designated public fora, "[r]easonable time, place and manner regulations are permissible, and a content-based prohibition must be narrowly drawn to effectuate a compelling state interest."  Perry, 460 U.S. at 45.  In this case, the regulation in question amounts to a wholesale preclusion of registered sex offenders from all public libraries in the City of Albuquerque. In this sense, the City's regulation parallels the appearance regulation that was challenged in Armstrong, because the effect of both regulations, which completely deny certain patrons any and all library access, "is to prevent [those] patrons from engaging in *any* conduct within, or use of, the library, [thereby directly limiting] protected First Amendment activities such as  reading, writing and quiet reflection. . . ."  Armstrong, 154 F.Supp.2d at 75 (emphasis in original).  To withstand constitutional scrutiny, then, the regulation in the instant case must be "narrowly tailored to serve a significant governmental interest and . . . leave open ample alternative channels for communication of ideas."  Perry, 460 U.S. at 45.

     As an initial matter, the Court notes that, as the party opposing summary judgment, the City bore the burden of "set[ting] forth [in its *Response*] specific facts showing a genuine

issue for trial." Fed.R.Civ.P. 56(e).  Moreover, judgment is appropriate "as a matter of law" if the nonmoving party has failed to make an adequate showing on an essential element of its case, as to which it has the burden of proof at trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Lopez v. LeMaster, 172 F.3d 756, 759 (10th Cir. 1999).  Accordingly, where John Doe questions the basis for the City's enactment of the regulation, the City, in accordance with its summary-judgment burden, might have responded by setting forth, for the record, the interest it sought to protect in banning all registered sex offenders from public libraries within the City of Albuquerque.  This it did not do.  Instead, the City asserts that "[t]he motivation for the ban is immaterial under the rubric of a facial challenge and Plaintiff's speculation about the purpose of the ban does not advance the inquiry." [Doc. 47 at 4].  Nevertheless, in a *footnote*, the City states that

> the Court could assume, *hypothetically*, that the following occurred: The City entered an agreement with schools near libraries so children can go to libraries after school and study. Shortly after the City entered this agreement with the schools, the attendance of young teens increased substantially between approximately 3:00 p.m. and 5:00 p.m. on weekdays in City libraries. The City noticed an increase in adult male presence in libraries in the same time frame.   The police began an undercover operation regarding a notorious sex offender who preys on young teens and found that this sex offender and other "preferential" sex offenders, who also prey on young teens, were frequenting the libraries at a dramatically increased rate on weekdays between 3:00 p.m. and 5:00 p.m. On January 31, 2008, newspapers reported that registered sex offender Corey Saunders raped a six year old in a New Bedford, [Massachusetts] public library. On March 4, 2008, the Mayor of Albuquerque banned all registered sex offenders from City libraries.

26

[Doc. 47 at 4 n.1 (emphasis added)].

There can be no doubt that the City possesses a significant interest in protecting children from crime, in general, and from the danger and harm associated with their coming in contact with sex offenders, in particular. John Doe concedes as much. [See Doc. 44 at 13 ("Plaintiff concedes that the City's interest in protecting children from any danger, including crimes containing a sexual element, is a significant one for purposes of this constitutional analysis."). The regulation is content-neutral, so "the test is whether [the City's] policy is a reasonable restriction on the time, place, or manner of protected [First Amendment rights] that is 'narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.'" Faustin, 423 F.3d at 1200 (quoting Perry, 460 U.S. at 45).

The Court concludes that the regulation in this case, as specifically written, which is a complete ban against registered sex offenders in any and all City of Albuquerque public libraries, is not narrowly tailored, nor does it leave open ample alternative channels for communication. As did the appearance regulation at issue in Armstrong, the regulation here "prevent[s] certain patrons from engaging in any conduct within, or use of, the library. . . ." Armstrong, 154 F.Supp.2d at 75 (emphasis in original). Consequently, "protected First Amendment activities such as reading, writing and quiet reflection are directly limited." Id. This all-out ban is very different from the challenged regulations in both Kreimer cases and in Neinast, where patrons desiring access to those libraries could secure access merely by complying with the rules. See Kreimer II, 958 F.2d at 1264 ("[W]e do not read the rule to

bar permanently a patron from reentry to the Library once the patron complies with the requirements. . . ."); Neinast, 346 F.3d at 595 (*quoting* Kreimer II, 958 F.2d at 1264 (explaining that "the requirement that patrons wear shoes leaves open alternative channels for communication [because 's]o long as a patron complies with the rules, he or she may use the Library's facilities.'").

A regulation is "narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." Frisby v. Schultz, 487 U.S. 485 (1988). To be sure, "[a] complete ban *can* be narrowly tailored, but only if each activity within the proscription's scope is an appropriately targeted evil." Id. (emphasis added). In this case, the Court does not view the regulation as narrowly tailored because, while the "targeted evil," based on the City's *hypothetical* example is (1) an increase in adult male presence, (2) between approximately the hours of 3:00 p.m. and 5:00 p.m., (3) on weekdays, (4) in libraries near schools, the regulation is not correspondingly limited in its sweep but, instead, provides absolutely that "[r]egistered sex offenders are not allowed in public libraries in the City of Albuquerque." [Doc. 1; Exh. 1]. Thus, while the properly targeted evil is susceptible to pinpointing by time (approximately the hours of 3:00 p.m. to 5:00 p.m.); day (weekdays); location (libraries near schools, which, pursuant to a City-school agreement have been made available for students' after-school studying); and offender (adult males), the regulation is far more expansive than would appear necessary to combat the unquestionably legitimate harm the City has identified. Accordingly, "the wholesale ban . . . in this case is not sufficiently narrowly tailored to withstand constitutional scrutiny. Indeed, it appears that the

regulation is not 'tailored' at all." <u>Cleveland Area Bd. of Realtors v. City of Euclid</u>, 88 F.3d 382, 388 (6th Cir. 1996) (city ordinance banning all residential yard signs was not narrowly tailored to serve significant governmental interest in aesthetics, nor did it leave open ample alternative channels for communication of information).  Finally, while the government need not employ the absolute least restrictive means to achieve its desired result, "a time, place, or manner regulation may [not] burden substantially more speech than is necessary to further the government's legitimate interests[, since g]overnment may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." <u>Ward</u>, 491 U.S. at 799.  As a wholesale ban that "prevents certain patrons from engaging in *any* conduct within, or use of [City of Albuquerque public] librar[ies]," <u>Armstrong</u>, 154 F.Supp.2d at 75 (emphasis in original) the regulation in question does precisely what is prohibited.

In addition to the fact that the regulation in the instant case is not narrowly tailored, the City has not demonstrated that it leaves open ample alternative channels of communication.  In this sense, again, the regulation in question is more analogous to the appearance regulation at issue in <u>Armstrong</u>, and more unlike those challenged in the <u>Kreimer</u> cases and <u>Neinast</u>, where a previously expelled library patron could regain entry by complying with the rules.  <u>See</u>  <u>Neinast</u>, 346 F.3d at 595 (*quoting* <u>Kreimer II</u>, 958 F.2d at 1264 (explaining that "the requirement that patrons wear shoes leaves open alternative channels for communication [because 's]o long as a patron complies with the rules, he or she may use the Library's facilities.'").

In this case, it is undisputed that "John Doe lives on a fixed disposable monthly income of approximately $728." [Doc. 44 at 7].  It also is undisputed that, in addition to using public libraries to check out books and other materials; peruse magazines and newspapers; and consult various resource materials, John Doe "attended various meetings, events, concerts, exhibits, and lectures at the Albuquerque public libraries. . . ." [Id. at 3]. Additionally, it is extremely unlikely that  at least some of the events and meetings that John Doe has attended at city libraries, such as public meetings of the Library Advisory Board, would be accessible to an individual who has been banned from public libraries. [See id.; Exh. 1 at 2; Affidavit of John Doe (explaining that public meetings and events that John Doe has in the past attended at city libraries include Friends of the Library Monthly Book Sales, Lunchtime Performance Series at the Main Library, and public meetings of the Library Advisory Board.)].

The City attempts to show that open ample alternative channels for communication of information exist in the form of the University of New Mexico libraries and the library of Central New Mexico Community College. [See Doc. 47 at 5 ("Plaintiff does not utilize University of New Mexico libraries in Albuquerque.  Plaintiff knows that the Central New Mexico Community College has a library in the City, but Plaintiff does not utilize that library.")].  These additional facts, however, do little to advance the City's proposition that ample alternative channels for communication of information exist, where the City has not also shown that these other libraries are available for John Doe's use.  With respect to the libraries of the University of New Mexico, John Doe testified through his deposition that

"their book selection and their library contents are different from the public library. There

are nowhere near as [many] mainstream works available at the UNM library. *Plus library*

*privileges at the UNM library cost money*." [Id.; Exh. C, John Doe depo. at 34 (emphasis

added)]. Given that John Doe undisputably lives on a monthly fixed income, it is not clear

that he has the financial means to access the libraries of the University of New Mexico. As

for the library at Central New Mexico Community College, John Doe testified that he does

not utilize it. [Id.; Exh. C, John Doe depo. at 36]. There is no explanation in the record as

to *why* he does not, or even if, as a non-student, he would be allowed to use it. He did,

however, testify, that since his privileges at City of Albuquerque public libraries were taken

away, he has been denied access to information, as well as "[t]he ability to do fairly extensive

research [at] libraries [that] have both periodical and reference material and databases." [Id.;

Exh. C, John Doe depo. at 34]. In John Doe's words, "there's been no way to really

compensate for the loss that's equal to what the public library system provided." [Id.; Exh.

C, John Doe depo. at 34]. Once again, as the nonmoving party, the City bore a summary-

judgment burden of making an adequate showing on the essentials element of its case, as to

which it would have the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317,

322-23 (1986); Lopez v. LeMaster, 172 F.3d 756, 759 (10th Cir. 1999). In this case, the City

has not satisfied its summary-judgment burden of demonstrating that the regulation in

question leaves open ample alternative channels for communication of information.

   The regulation in question (1) directly impacts the fundamental and protected First

Amendment right to receive information, see Lamont, 381 U.S. at 308 (Brennan, J.,

concurring); (2) is (at least in its present form as a complete ban of certain individuals from public libraries) not narrowly tailored to serve an admittedly significant government interest, see Cleveland Area Bd. of Realtors, 88 F.3d at 388; and (3) does not leave open ample alternative channels for communication of information, cf. Neinast, 346 F.3d at 595. The regulation therefore creates "an unacceptable risk of the suppression of ideas." Am. Target Advertising, Inc., 199 F.3d at 1247. The regulation does not satisfy strict scrutiny.

## 2. Intermediate Scrutiny

In the alternative, the Court also concludes that the City's regulation banning registered sex offenders from public libraries fails the test of intermediate scrutiny. While

> the most exacting scrutiny [applies] to regulations that suppress, disadvantage, or impose differential burdens upon speech because of its content[, . . . ] regulations that are *unrelated to the content of speech* are subject to an intermediate level of scrutiny . . . because in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue.

Turner Broadcasting Sys. Inc. v. F.C.C., 512 U.S. 622, 642 (1994) (emphasis added) (*citing* Clark v. Cmty for Creative Non-Violence, 468 U.S. 288, 293 (1984)).

The Supreme Court has explained that "the 'principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of [agreement or] disagreement with the message it conveys.'" Turner Broadcasting Sys. Inc., 512 U.S. at 642 (*quoting* Ward, 491 U.S. at 791). The Court also has noted that, as a general rule, "laws that by their terms distinguish favored speech from disfavored speech on the basis

32

of the ideas or views expressed are content based[, while] laws that confer benefits or impose burdens on speech without reference to the ideas or views expressed are in most instances content neutral." Id. For purposes of its "intermediate scrutiny" analysis, the Court assumes that the regulation in question is content neutral, inasmuch as it is silent with respect to the restricted parties' points of view. See Members of City Council of City of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 804 (1984).

Under intermediate scrutiny, a challenged restriction must: (1) be within the constitutional power of government to adopt; (2) further an important or substantial governmental interest; which (3) is unrelated to the suppression of expression; and (4) be no greater restriction on First Amendment freedom than is essential to furtherance of the government's purpose. Heideman v. South Salt Lake City, 348 F.3d 1182, 1197 (10th Cir. 2003).

Assuming without deciding that the regulation in question here satisfies elements (1) through (3), for reasons discussed more fully above, a complete and wholesale ban that prevents all registered sex offenders from entering any and all public libraries within the City of Albuquerque imposes a greater restriction on the burdened parties' protected First Amendment rights than is essential to further the City's purpose. The Court has already explained that, while the challenged regulation amounts to an outright ban keeping certain potential patrons from any use of the public libraries, the targeted evil is more precisely identifiable by time (approximately the hours of 3:00 p.m. to 5:00 p.m.); day (weekdays); location (libraries near schools, which, pursuant to a City-school agreement have been made

available for students' after-school studying); and offender (adult males).   The Court therefore repeats its observation that the City's regulation is far more expansive than would appear necessary to combat the unquestionably legitimate evil the City has identified.[7]

## F. The Fourteenth Amendment: Substantive Due Process

In addition to challenging the regulation on First Amendment grounds, John Doe also asserts that, in extinguishing his fundamental rights to receive information and to assemble at City of Albuquerque public libraries, the City has deprived him of substantive due process, in violation of the Fourteenth Amendment. [See Doc. 44 at 19-21].

The Fourteenth Amendment provides, in pertinent part, that states shall not "deprive any person of life, liberty, or property, without due process of law ." U.S. CONST. AMEND. XIV. The due process clause contains both a procedural aspect and "a substantive sphere as well, barring certain government actions regardless of the fairness of the procedures used to implement them." Cty. of Sacramento v. Lewis, 523 U.S. 833, 840 (1998) (citations omitted).

_____

[7]  Although the Court believes that strict scrutiny applies to the unique circumstances presented by the instant case, the Court, for purposes of making a complete record, nevertheless has analyzed the regulation in question under the alternative but heightened standard of intermediate scrutiny because while it is evident that the regulation directly impacts the fundamental First Amendment right to receive information, see, e.g., Lamont, 381 U.S. at 308 (Brennan, J., concurring); Armstrong, 154 F.Supp.2d at 75, it also can fairly be said that the regulation is content neutral, see Taxpayers for Vincent, 466 U.S. at 804.  Because the regulation clearly burdens protected First Amendment rights, the Court does not analyze the regulation under the "rational basis" standard of review.  Cf. KT.& G Corp v. Attorney General of State of Okla., 535 F.3d 1114, 1133-36 (10th Cir. 2008) (applying "rational basis" review, not strict scrutiny, where allocable share amendments resulting from tobacco litigation did not burden plaintiffs' First Amendment rights); see also Dodger's Bar & Grill, Inc. v. Johnson Cty. Bd. of Cty. Comm'rs, 32 F.3d 1436, 1441 (10th Cir. 1994) ("When a regulation does not impinge upon a 'fundamental right,' the state need only articulate a rational basis for the exercise of police power. . . .").

The Court need not devote significant time to an analysis of John Doe's due process claims because, with respect to those counts of his *Complaint* in which he had originally asserted *procedural* due process violations, he has voluntarily dismissed those claims and is not reasserting them. [See Doc. 36 (*Stipulation of Dismissal of Counts III and VII With Prejudice*); see also Doc. 51 at 18 ("Plaintiff dropped his procedural due process claim and is not reasserting it[.]")].

With respect to John Doe's claims that he has been denied *substantive* due process, the Supreme Court has held "that '[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.'" Cty. of Sacramento, 523 U.S. at 842 (*quoting* Albright v. Oliver, 510 U.S. 266, 273 (1994)). Because, as explained in great detail above, the First Amendment provides an explicit source of constitutional protection for John Doe's claims, he cannot maintain a substantive due process claim as well.  See Haagensen v. Pennsylvania State Police, 2010 WL 256578, at *18 (W.D.Pa. Jan. 20, 2010) (plaintiff could not maintain Fourteenth Amendment substantive due process claim in addition to her First Amendment claims, since First Amendment provided her "an explicit textual source of constitutional protection against" the challenged government behavior).

### G. The Fourteenth Amendment: Equal Protection

As his final federal claim, John Doe contends that the effect of the regulation in

question is to deny him equal protection of the laws, as is guaranteed under the Fourteenth Amendment's equal protection provision, and that the City "has discriminated against [him] on the basis of his status as a registered sex offender without a rational basis." [Doc. 1; Exh. A at 6].

The Fourteenth Amendment provides, in pertinent part, that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. AMEND. XIV. "'Strict scrutiny' and 'rational basis' are the two traditional standards used to determine the validity of legislation that is challenged as denying equal protection. The strict scrutiny standard is applied when a classification involves a suspect class *or affects a fundamental right.*" Edwards v. Valdez, 789 F.2d 1477, 1482 (10th Cir. 1986) (emphasis added). To be sure, "[g]overnment classification that *actually jeopardizes the exercise of a fundamental right* or a suspect class . . . must be reviewed under a strict scrutiny standard and must be precisely tailored to further a compelling governmental interest." Goetz v. Glickman, 149 F.3d 1131, 1140 (10th Cir. 1998) (emphasis added).

By contrast, if no fundamental right or suspect class is involved, "the Equal Protection Clause only requires that the classification rationally further a legitimate governmental interest." Goetz, 149 F.3d at 1140. This "rational basis" review constitutes the lowest level of equal protection scrutiny. Moreover, "legislation subject to rational basis review is presumptively constitutional [and] the burden is on the [challenging party] to establish that the statute is irrational or arbitrary and that it cannot conceivably further a legitimate governmental interest." United States v. Phelps, 17 F.3d 1334, 1344-45 (10th Cir. 1994).

Our Tenth Circuit has held that sex offenders do not constitute a suspect class. Riddle v. Mondragon, 83 F.3d 1197, 1207 (10th Cir. 1996). Accordingly, legislation, rules, and even dissimilar treatment that discriminate on the basis of sex-offender status routinely are reviewed—by the Tenth and other circuits—for a rational basis. See, e.g., Mariani v. Stommel, 2007 WL 3011332 (10th Cir. Oct. 16, 2007) (under rational review, regulation providing prisoner with right to appeal sex-offender classification if he had not been adjudicated of sex offense, but that did not provide such right to adjudicated offenders, did not violate equal protection); Lustgarden v. Gunter, 966 F.2d 552 (10th Cir. 1992) (Colorado sex-offense parole statute that dictated that parole for individuals convicted of sex offenses was discretionary, not mandatory, was rationally related to legitimate state interest of monitoring reintroduction of sex offenders into society); Doe v. Moore, 410 F.3d 1337, 1348 (11th Cir. 2005) ("Florida's various classifications and sub-classifications for sex offender registration are rationally related to a legitimate governmental purpose and, therefore, constitutional under the Equal Protection Clause."); United States v. LeMay, 260 F.3d 1018, 1031 (9th Cir. 2001) (Rule 414 of Federal Rules of Evidence bears reasonable relationship to legitimate governmental interest of allowing introduction at trial of relevant evidence to help convict sex offenders); Cutshall v. Sundquist, 193 F.3d 466, 482-483 (6th Cir. 1999) (Tennessee Sex Offender Registration and Monitoring Act, which required sex offenders to register with law enforcement agencies and allowed law enforcement officials to release registry information when necessary to protect the public, did not violate Equal Protection Clause because Act had rational basis in legitimate concerns about law enforcement and

public safety with respect to sex offenses); <u>Roe v. Marcotte</u>, 193 F.3d 72, 82 (2nd Cir. 1999) (Connecticut statute that, among other things, distinguished between individuals convicted of crimes characterized as sexual offenses and those convicted of other violent offenses, did not violate Equal Protection Clause).

This is not to say, however, that a rule or statute that imposes burdens on the basis of sex-offender status will always be deemed rationally related to a legitimate state interest. Such was the case in <u>Doe v. Pennsylvania Bd. of Prob. and Parole</u>, which involved an equal protection challenge to provisions of Pennsylvania's "Megan's Law" stating that any out-of-state sex offender who transferred his supervision to Pennsylvania was subject to community notification, whereas an individual who was convicted of the same offense in Pennsylvania would only be subject to community notification if, after a civil hearing, he had been designated a sexually violent predator due to a mental abnormality or personality disorder making that person likely to engage in predatory sexually violent offenses. <u>Doe v. Pennsylvania Bd. of Prob. and Parole</u>, 513 F.3d 95, 98 (3rd Cir. 2008) (internal quotation omitted). Applying "rational basis" review, the Third Circuit held that each of the four reasons[8] advanced by the Commonwealth of Pennsylvania as support for its position that its disparate treatment of in-state and out-of-state sex offenders was rationally related to the

---

[8] Those reasons were that (1) it would be impossible to replicate, for out-of-state offenders, the legal proceedings that Pennsylvania provided in-state offenders; (2) providing such proceedings to out-of-state offenders would increase time and expense; (3) the "harshness" of community notification differed for in-state and out-of-state offenders; and (4) the publicity given to a sex offender's trial in Pennsylvania rationalized the disparate treatment of out-of-state offenders whose trials were less likely to receive media attention in the Commonwealth. <u>Doe</u>, 513 F.3d at 108.

legitimate state interest of pubic safety was meritless and, therefore, irrational, particularly where Pennsylvania was a signatory to the *Interstate Compact Concerning Parole and Probation* ("the Compact").  Id. at 112.  By signing and binding itself to the terms of the Compact, Pennsylvania had statutorily promised the other signatories that it would "approximate the same procedures and standards it applie[d] to its own probationers."  Id. at 108.  In treating out-of-state offenders differently from in-state offenders, Pennsylvania was altering the terms of the Compact by placing additional conditions on the transfer of parolees and probationers who otherwise would satisfy the Compact's requirements.  Id. at 110-111.  Because each of the four reasons proffered by the Commonwealth in support of the added burdens was contrary to the promises it made when it signed the Compact, none of those reasons could be considered rational.  Id. at 112 n.1.  In short, the circuit concluded that while "Pennsylvania's interest in protecting its citizens from sexually violent predators [was] certainly compelling . . . , subjecting out-of state sex offenders to community notification without providing equivalent procedural safeguards as given to in-state sex offenders [was] not rationally related to that goal."  Id. at 112.

Because it determined that Pennsylvania's disparate treatment of in-state and out-of-state offenders could not survive even the deference accorded under "rational basis" review, the district court in Doe had not addressed whether Mr. Doe possessed a fundamental right subject to strict scrutiny and, therefore, neither did the Third Circuit.  Doe, 513 F.3d at 107; see also Doe v. McVey, 381 F.Supp.2d 443 (E.D.Pa. 2005).  However, it must be remembered that it is *either* the burdening of a fundamental right, *or* the involvement of a

39

suspect class that triggers strict scrutiny.  See Edwards, 789 F.2d at 1482 ("The strict scrutiny standard is applied when a classification involves a suspect class or affects a fundamental right.").

        In this case, even though John Doe, as a registered sex offender, is not a member of a suspect class, he has alleged (and the Court, as explained in depth above, has determined) that he possesses a fundamental First Amendment right to receive information, which the City has "actually jeopardize[d]" by enacting a wholesale ban prohibiting all registered sex offenders from accessing any and all City of Albuquerque public libraries.  Goetz, 149 F.3d at 1140.  The right to receive information is the necessary corollary to the protected First Amendment right guaranteeing freedom of speech.  See Stanley, 394 U.S. at 564; Lamont, 381 U.S. at 308 (Brennan, J., concurring); Conant, 309 F.3d at 643 (Kozinski, J., concurring) ("[T]he right to hear and the right to speak are flip sides of the same coin.").  Although the right to receive information may not be specifically guaranteed by the text of the First Amendment, it nevertheless is a fundamental right inasmuch as it is "necessary to make the express guarantees fully meaningful."  Lamont, 381 U.S. at 308 (Brennan, J., concurring); see also San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 33 (1973) (the answer to whether a right is fundamental "lies in assessing whether [the] right [is] explicitly or implicitly guaranteed by the Constitution") (emphasis added).

        Additionally, government restrictions on protected First Amendment activity occurring in a public library, which amounts to a designated public forum, see Hawkins, 170 F.3d at 1287, must satisfy the same "narrowly tailored" requirement that applies to

restrictions on protected First Amendment taking place in such "quintessential public fora" as are streets, parks, and public sidewalks." Perry, 460 U.S. at 45.  That is to say, "[w]hen government regulation discriminates among speech-related activities in a public forum, the Equal Protection Clause mandates that the legislation be finely tailored to serve substantial state interests, and the justifications offered for any distinctions it draws must be carefully scrutinized."  Carey v. Brown, 447 U.S. 455, 461-462 (1980).

 The challenged regulation in the instant case, which, again, amounts to a wholesale ban extinguishing John Doe's fundamental and protected First Amendment right to receive information, is not "finely tailored," which is what the Fourteenth Amendment's equal protection provision demands when a fundamental right is burdened. See Carey, 447 U.S. at 461-462.  As already explained above, the City has identified the "targeted evil" in this case as an increase in adult male presence between approximately the hours of 3:00 p.m. and 5:00 p.m. on weekdays in libraries near schools. [See Doc. 47 at 4 n.1].  The regulation, however, demonstrates no fine tailoring, as it provides that "[r]egistered sex offenders are not allowed in public libraries in the City of Albuquerque."  [Doc. 1; Exh. 1].  As the challenged regulation is currently written, and employing the level of review that the Court is constrained to apply, the regulation does not satisfy the Fourteenth Amendment's equal protection clause.  The City's regulation, in its present form, must be stricken.

## III. CONCLUSION

 This Court has struggled in this case to strike the proper legal balance between competing interests, and, in the process, to discern and apply to the particular facts presented

in the record before me the correct legal standard. On one side of the equation here is the City, which no reasonable person could or would contend does *not* have a legitimate and compelling interest in promoting and ensuring public safety and, more specifically, protecting children from harm, danger and crime, especially crimes of a sexual nature.  On the other side of the equation is a group of individuals that, no matter how reviled, nevertheless possesses certain constitutional rights.  When those rights are burdened or, in this case, wholly extinguished by an action of government, this Court has an obligation to scrutinize the facts and the law closely, carefully, and objectively to ensure that, whatever the end result, it is just.  In this case, having done just this, the Court concludes that the City's regulation, *as currently written* and *in its present form*, cannot stand.  Accordingly, the Court will grant John Doe's summary-judgment motion.

IT IS, THEREFORE, ORDERED** that *Plaintiff's Motion for Summary Judgment* [Doc. 43] is **GRANTED;**

IT IS FURTHER ORDERED** that the City of Albuquerque be and hereby is **ENJOINED** from enforcing the terms of the Administrative Instruction banning registered sex offenders from public libraries, as that Administrative Instruction is currently written.

SO ORDERED** this 31st day of March, 2010, in Albuquerque, New Mexico.

**M. CHRISTINA ARMIJO**
United States District Judge